UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Carroll Dutton, | ) | |
| | ) | C/A No.: 4:13-cv-1888-DCN-TER |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REPORT AND RECOMMENDATION |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for Supplemental Social Security Benefits (SSI) and Disability Insurance Benefits (DIB). The only issues before the Court are whether the findings of fact are supported by substantial evidence and whether proper legal standards have been applied. This case was referred to the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), (D.S.C.).

## I. PROCEDURAL HISTORY

On July 6, 2009, Plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits, alleging that he became disabled in April 2008 due to panic attacks. (Tr. 14, 166). Following a hearing, Administrative Law Judge (ALJ) Arthur L. Conover denied Plaintiff's claims on February 17, 2012, finding that he did not meet the strict standard for disability under the Act (Tr. 14-24). The Appeals Council subsequently denied Plaintiff's request for review making the ALJ's decision final for purposes of judicial review. On July 9, 2013, Plaintiff brought this action challenging the Commissioner's decision under 42 U.S.C. § 405(g).

## II.  INTRODUCTORY FACTS

Plaintiff was born on September 27, 1966. (Tr. 23). His alleged onset date of disability is April 30, 2008, at which time he was 41 years old. Plaintiff has a "limited" education and has past relevant work as an electrician's helper. (Tr. 23).

## III.  THE ALJ'S DECISION

In the decision of February 17, 2012, the ALJ found the following:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. The claimant has not engaged in substantial gainful activity since April 30, 2008, the alleged onset date (20 CFR 404.1571, *et seq*. and 416.971 *et seq*.).

3. The claimant has the following severe impairments: an organic mental disorder, a generalized anxiety disorder, an affective disorder, borderline intellectual functioning, back/neck osteoarthritis, residuals of right rotator cuff tear surgery and a left hip dislocation (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or  medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform simple, routine light work, as defined in 20 CFR 404.1567(b) and 416.967(b).  The undersigned also determines that the claimant can occasionally push/pull with the left leg, can occasionally climb ramps and stairs, stoop, kneel, and crawl.  He cannot climb ladders, ropes, and scaffolds, or reach overhead with his right dominant arm.  He needs to avoid exposure to vibrations and to heights and

2

dangerous machinery. He needs to avoid large crowds in the workplace, and he should not wait on the public as customers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on September 27, 1966 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from April 30, 2008, through date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-24).

The Commissioner argues that the ALJ's decision was based on substantial evidence. The phrase "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390-401, (1971). Under the Social Security Act, 42 U.S.C. § 405 (g), the scope of review of the Commissioner's final decision is limited to: (1) whether the decision of the Commissioner is supported by substantial evidence and

(2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a (1988). An ALJ must consider (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock,

4

483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary.  20 C.F.R.

§ 404.1503(a).  Hall v. Harris, 658 F.2d 260 (4th Cir. 1981).  An ALJ's factual determinations must

be upheld if supported by substantial evidence and proper legal standards were applied.  Smith v.

Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant

work as it is customarily performed in the economy or as the claimant actually performed the work.

SSR 82-62.  The claimant bears the burden of establishing his inability to work within the meaning

of the Social Security Act.  42 U.S.C. § 423 (d)(5).  He must make a prima facie showing of

disability by showing he was unable to return to his past relevant work.  Grant v. Schweiker, 699

F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden

is on the Commissioner to come forward with evidence that the plaintiff can perform alternative

work and that such work exists in the regional economy. The Commissioner may carry the burden

of demonstrating the existence of jobs available in the national economy that the plaintiff can

perform despite the existence of impairments which prevent the return to past relevant work by

obtaining testimony from a vocational expert.  Id. at 191.

## IV. ARGUMENTS

The Plaintiff argues that the ALJ erred in his decision. Specifically, Plaintiff raises the

following arguments in his brief, quoted verbatim:

> 1.    Opinion Evidence.  The opinions of Dr. Thompson, an examining physician
>        contain work-preclusive limitations which the ALJ improperly ignored.
>        Where the ALJ improperly ignores the opinion evidence, can his decision be
>        supported by substantial evidence;

      1.1     Dr. Thompson's total opinions, if acknowledged and accepted, would support a finding of disability

      1.2     The ALJ's evaluation of Dr. Thompson's opinions was insufficient to support his decision

          1.2.1   The ALJ seemingly accepted Dr. Thompson's opinions but failed to indicate the weight he assigned to them, in violation of well settled law

          1.2.2   The ALJ failed to properly acknowledge the totality of Dr. Thompson's opinions, in violation of settled law

2.     Residual Functional Capacity. The RFC assessment must be a reasoned assessment of all of the relevant evidence. The ALJ here failed to include all of Dutton's credible limitations and failed [to] provide an adequate discussion to support his finding. Can a decision based upon an incomplete and inaccurate assessment of a claimant's RFC [be] supported by substantial evidence?

      2.1     The ALJ failed to perform the necessary function-by-function assessments

      2.2     The ALJ failed to consider all of Dutton's upper extremity limitations which are supported by the record

      2.3     A greater limitation in use of the right arm is critical to the outcome of this case

(Plaintiff's brief).

Defendant argues that substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled within the meaning of the Act.

## V. MEDICAL RECORDS

By way of background, the Court notes that Plaintiff was hospitalized between August 5, 2000 and August 10, 2000 for depression and with reported prior suicidal and homicidal ideation. He was diagnosed with depression NOS and marijuana and alcohol abuse. He was prescribed Paxil and discharged with instructions to seek follow-up mental health treatment. (Tr. 223-228, 256-263). Plaintiff received a follow-up evaluation at the Spartanburg Area Mental Health Clinic on August

15, 2000. He was appropriately oriented, had a poor memory, and reported an inability to concentrate and being easily distracted. (Tr. 231-235). On November 30, 2001, Plaintiff was discharged for services after not returning. (Tr. 230). Additionally, on October 16, 2003, Plaintiff was treated in the emergency room for neck strain and facial abrasions following a motor vehicle accident. (Tr. 237-240).

On October 26, 2009, Ron O. Thompson, Ph.D., performed a consultative examination of Plaintiff at the Commissioner's request. Dr. Thompson noted that Plaintiff was a "bit" restless and that he occasionally popped his fingers during the interview. Plaintiff reported occasional panic attacks. Dr. Thompson noted that Plaintiff also complained of symptoms consistent with mild to moderate agoraphobia. Plaintiff's speech was "essentially coherent" but expressive language "seemed a bit difficult for him." Plaintiff reported becoming uncomfortable around people and losing his last job after getting paranoid that people were talking about him. Dr. Thompson noted that Plaintiff was rambling and needed interruption and redirection. Dr. Thompson indicated that Plaintiff endorsed a history of "suspiciousness of the actions and intentions of others" which Plaintiff reported following a motor vehicle accident where he injured his neck and shoulders. Plaintiff reported that he had not received any treatment in 7 years but was suffering from headaches and pain and numbness from his neck down to his fingers. Plaintiff indicated that he had frequent anxiety and panic because he cannot work, cannot pay his bills, is dependent on his parents, and cannot take care of his 15 year old child. Dr. Thompson noted that Plaintiff was appropriately oriented. Plaintiff could follow simple instructions but "loses concentration due to what appears to be anxiety short-circuiting under even mild psychological stress." Plaintiff's insight and judgment appeared to be adequate. He was able to make a simple cash transaction but not a detailed one due to concentration loss. On

cognitive screening tasks, Plaintiff's breathing became shallower and he became tenser. Dr. Thompson stated that Plaintiff was able to communicate adequately, but "as concentration lapses become more apparent, there are some delays in cognitive spontaneity." Dr. Thompson noted that Plaintiff had some obsessive rumination about his current situation which may have been filling Plaintiff's anxiety. Dr. Thompson indicated that Plaintiff was "quite preoccupied by with psychological symptoms and physical discomfort that appears to be playing into his anxiety level and there is some moderate depressive symptoms as well." Dr. Thompson estimated Plaintiff's intelligence to fall in the borderline range. Dr. Thompson stated that Plaintiff did not appear to be in acute distress but seemed to be in need of a comprehensive physical. Dr. Thompson's impressions were: 1) Long history of anxiety disorder, not otherwise specified as reported by the claimant; 2) adjustment disorder with major depressive features, moderate; 3) adjustment disorder with generalized anxiety and mild to moderate agoraphobia superimposed upon #1; and, 4) psychological stressors – parents ill, mother in hospice, no access to health care, apparently in need of medical attention, living with parents, no income. Dr. Thompson stated that Plaintiff was in "dire straits in terms of his current situational issues and is experiencing moderately severe anxiety and depressive features." Dr. Thompson stated, "As he presents today, I believe he would have difficulty maintaining pace and persistence in simple repetitive types of tasks." Dr. Thompson noted that Plaintiff needed a comprehensive physical and would benefit from psychotropic medication. (Tr. 270-272).

A Psychiatric Review Technique Questionnaire and Mental Residual Functional Capacity Assessment were completed by Craig Horn, a non-examining doctor on contract to the Administration, on November 9, 2009. (Tr. 274-287, 288-291). Dr. Horn indicated that Plaintiff had

medically determinable mental impairments causing mild restriction in daily activities, moderate difficulties in social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Dr. Horn indicated that Plaintiff had the ability for "simple routine tasks away from public." (Tr. 286).

A Psychiatric Review Technique Questionnaire and Mental Residual Functional Capacity Assessment were completed by Edward Waller, a non-examining doctor on contract to the Administration, on August 17, 2010. Dr. Waller concluded that:

> [Plaintiff] is able to understand and remember short and simple instructions and is capable of performing simple tasks without special supervision. He is capable of maintaining a regular work schedule, but may miss an occasional workday due to depression. He is able to sustain appropriate interaction with peers and co-workers without significant interference in work. He would perform better in a job setting that does not require ongoing interaction with the public. He can make simple work related decisions, request assistance from others, and use available transportation. He can adhere to basic standards of hygiene and safety.

(Tr. 294, also Tr. 322).

On August 25, 2010, W. Russell Rowland, M.D., performed a consultative examination of Plaintiff at the Commissioner's request. Plaintiff reported pain in his right anterior shoulder, occasional left shoulder pain, pain in his posterior neck and right upper extremity, low back pain, headaches, and occasional sleep problems. Dr. Rowland noted that Plaintiff had been in a motor vehicle accident 7 years prior. Plaintiff reported pain in his neck and right arm since that accident. Plaintiff reported his neck pain as a "9 out of 10 all the time" and his right arm pain as a dull ache in the lateral arm and dorsal forearm with numbness in his right 4th and 5th fingers dorsally. Dr. Rowland noted that Plaintiff's low back pain had been present since a work-related fall in 1993. Plaintiff reported receiving some treatment after that accident which stopped after his workers' compensation case settled. Plaintiff reported daily activities of going to the grocery store with his

girlfriend once a month and taking daily walks in the woods behind his house to "get to a quiet place." Plaintiff indicated that his low back pain "comes and goes." He estimated that he could "sit about 45 minutes and stand about one hour." Plaintiff reported dull, aching headaches occurring 2 to 3 times each week and starting at the back of his neck and going across the top of his head to the bifrontal area. Plaintiff's medications included only Extra Strength Tylenol which helped his headaches "some." Dr. Rowland noted that Plaintiff experienced occasional depression but stated this did "not appear to be a significant problem." Plaintiff indicated that he did not like to be around people and had always been that way. Dr. Rowland stated that Plaintiff's motivation was "plus or minus and could not get a direct answer, concentration is decreased." Dr. Rowland noted that Plaintiff lived with his girlfriend of 6 years and had 5 children. Plaintiff reportedly did "most of the cooking; will sweep, vacuum, do dishes, and helps her with beds, but does not do laundry. He does not do yard work and drives very little." Physical examination showed reduced range of motion of the right shoulder; squatting to 50%; tenderness in the posterior cervical spine; tightness and some tenderness in the right upper paraspinous muscle; reduced range of motion in the cervical and lumbar spines; and, decreased pin sensation in the right arm, both lateral calves, and feet. Dr. Rowland diagnosed: 1) right shoulder pain with tenderness over the acromioclavicular joint and probably some arthritis there; 2) pain in the posterior cervical spine in the right upper paraspinous area with tenderness. He is having aching pain in the right upper extremity, lateral arm, dorsal forearm, and some sensory loss as described. It is difficult to pinpoint a particular nerve root. It would suggest C5 in the arm, C6 in the forearm, and dorsal fourth and fifth fingers loss of sensation suggests C8; 3) chronic low back pain since 1993 with decreased range of motion, some sensory loss as above. There are no radicular symptoms. This suggests possibly some L5 sensory loss in both legs; 4) headaches 2 to 3 times a week, posterior neck, top of head, and bifrontal and sounds like muscle contraction;

and, 5) questionable mild depression. Dr. Rowland recommended x-rays and follow-up treatment with a free medical clinic. (Tr. 296-300).

A Physical Residual Functional Capacity Assessment was completed by James Weston, a non-examining doctor on contract to the Administration, on September 15, 2010. He found Plaintiff capable of lifting and carrying 20 lbs. occasionally and 10 lbs. frequently, standing/walking about 6 hours in an 8 hour workday, and sitting about 6 hours in an 8 hour workday. Dr. Weston found that Plaintiff could frequently balance and could occasionally perform all other postural abilities. (Tr. 303-309).

On September 24, 2010, Timothy Dancy, M.D., evaluated Plaintiff for neck and right shoulder pain. Dr. Dancy noted that Plaintiff had a long-standing history of pain starting with a work-related accident but had not been treating until recently. Plaintiff reported severe, sharp pain in the right side of his neck and down into his right shoulder. Plaintiff also reported having some tingling down into the dorsum of his hand and lateral fingers and he stated that it hurts to lift his arm up. Plaintiff's pain was waking him up at night. On examination Plaintiff had moderate tenderness over the cervical spine in the right paracervicals and nodularity and spasm in the cervical muscles. Plaintiff had full flexion and extension in his neck but decreased side bending and rotation. Plaintiff had some decreased range of motion in his right shoulder. Cervical x-rays showed degenerative disc changes at C4-5 and C5-6. Dr. Dancy diagnosed subacromial impingement and cervical radiculopathy. Dr. Dancy started Plaintiff on Mobic and injected Plaintiff's right shoulder. (Tr. 360-362).

On September 20, 2010, Plaintiff was evaluated at Lawrence Family Practice for neck pain and right shoulder, arm, and hand pain. Plaintiff reported not receiving any treatment due to his "pay status." Plaintiff had palpable tensed muscles in his cervical spine and bilateral shoulders. He was

assessed with neck pain and prescribed Flexeril and Ultram. He was also advised on smoking cessation. (Tr. 339-340).

On October 21, 2010, Vincent Green, M.D., of Lawrence Family Practice, evaluated Plaintiff for persistent neck and arm pain. Plaintiff reported chronic neck pain that radiates from the back of his neck to his right shoulder and down his right arm. He also reported frequent numbness in his fingers on his right hand. The recently prescribed medications "did not seem to be working for him." Plaintiff had very stiff movement in rotation and flexion of his neck and positive mild crepitus at the base of his neck. Dr. Green diagnosed brachial neuritis and radiculitis. Dr. Green stopped Ultram and Flexeril and started Plaintiff on diclofenac and Soma. Dr. Green also ordered a cervical MRI. (Tr 337-338).

On November 3, 2010, Plaintiff had an MRI of his cervical spine which showed mild disc osteophyte pathology or small protrusions at several levels and areas of mild neural foraminal stenosis. (Tr. 324-325).

On November 4, 2010, Dr. Green reevaluated Plaintiff for continued right shoulder and arm pain. Plaintiff reported that the diclofenac and Soma were not helping his pain much. Dr. Green indicated that Plaintiff had normal range of motion and no sensory deficits in his upper extremities. Dr. Green indicated that Plaintiff's right arm weakness warranted an orthopedic evaluation. Dr. Green switched Plaintiff's Soma to Darvocet. (Tr. 335-336). On December 8, 2010, Dr. Green evaluated Plaintiff for chronic neck and arm pain. Plaintiff had stopped taking Darvocet due to a recall. Plaintiff reported that his right shoulder was "very painful" and he was having difficulty dressing due to pain. Plaintiff's right shoulder range of motion was limited due to pain. Dr. Green switched Plaintiff's Darvocet to Tylenol 3 and indicated that they were waiting for insurance

12

approval to see an orthopedic. (Tr. 332-333).

On December 20, 2010, John M. Hibbitts, M.D., of Palmetto Bone and Joint, evaluated Plaintiff for a long-standing history of right shoulder pain with numbness into his fingers. Plaintiff reported several accidents over the years leading to intermittent shoulder and neck pain and consistent pain with any attempt to reach his arm away from his body. He also reported occasional numbness in all of his fingers. Dr. Hibbitts indicated that Plaintiff had positive Neer and Hawkin's, tenderness over the AC joint, weak external rotation, reduced range of motion, and positive Speed's test. Dr. Hibbitts diagnosed rotator cuff tendonosis versus tear, and biceps tendonosis and AC joint arthrosis. He ordered an MRI and gave Plaintiff's shoulder injections. (Tr. 329).

On December 28, 2010, Dr. Hibbitts reevaluated Plaintiff and indicated that Plaintiff was still waiting for insurance approval to get an MRI. Plaintiff reported that the prior injections had helped with pain but did not get rid of it completely. Plaintiff continued to have trouble with abduction and forward flexion of the shoulder. (Tr. 328).

On December 30, 2010, Plaintiff had an MRI of his right shoulder which showed a moderate grade partial thickness articular surface tear, mild subacromial and subdeltoid bursitis, a small amount of edema in the anterior head of the deltoid muscle, and mild degenerative change of the AC joint with a small amount of fluid signal in the AC joint which most likely was a small joint effusion and or a small amount of synovitis. (Tr. 326-327).

On January 4, 2011, Dr. Hibbitts evaluated Plaintiff and reviewed the MRI results. Dr. Hibbitts indicated that testing showed a high-grade, near complete superspinatus tear which "clearly explains his pain and weakness" to the right shoulder. Dr. Hibbitts noted some AC joint arthritic changes as well. Dr. Hibbitts recommended arthroscopically assisted rotator cuff repair and Plaintiff

13

agreed with this recommendation. (Tr 328).

On February 2, 2011, Dr. Green evaluated Plaintiff in follow-up. Plaintiff reported persistent right shoulder and neck pain with some muscle spasms. Dr. Green indicated that Plaintiff was scheduled to have shoulder surgery the following week. He refilled Plaintiff's prescriptions for diclofenac and Tylenol 3 and started Plaintiff on Flexeril. (Tr. 330-331).

On February 4, 2011, Dr. Hibbitts completed a Questionnaire regarding Plaintiff indicating that if Plaintiff attempted to work on an 8-hour day, 5-day a week basis he could not engage in anything more than "sedentary" work. Dr. Hibbitts indicated that if Plaintiff attempted to work on an 8-hour day, 5-day a week basis it would be most probable that he would have problems with attention and concentration sufficient enough to frequently interrupt tasks during the working portion of the workday. The diagnosis underlying these limitations was "recent rotator cuff repair" and the basis for the limitations was "protect repair site." (Tr. 341)

On March 2, 2011, Plaintiff had a hair drug test which was positive for codeine. (Tr. 343).

On March 25, 2011, Dr. Hibbitts evaluated Plaintiff and indicated that Plaintiff had been tolerating passive motion regimen with therapy. (Tr. 348). On April 7, 2011, Dr. Hibbitts noted that Plaintiff had fallen off a roof landing on his left leg and right shoulder causing a left hip dislocation and a comminuted greater tuberosity fracture of the right shoulder. Plaintiff had swelling in the shoulder and was ambulating with a knee immobilizer and crutch. Dr. Hibbitts stated that Plaintiff's fracture required an open suture repair and revision which was scheduled. Dr. Hibbitts also advised continued use of the knee immobilizer and weight bearing as tolerated. (Tr. 348).

On April 18, 2011, Dr. Hibbitts evaluated Plaintiff and noted that Plaintiff was having expected post-operative pain. Dr. Hibbitts advised continued use of a sling and avoidance of active

14

motion. (Tr. 347). On April 25, 2011, Dr. Hibbitts changed Plaintiff's medication from Oxy IR to Lortab because Plaintiff was having problems with nausea. (Tr. 346). On May 9, 2011, Plaintiff reported a gradual improvement in his pain. Plaintiff reported popping over his left groin where his hip location occurred but he indicated that this was not "as big as an issue" as his right shoulder. Right shoulder x-rays showed overall intact hardware fixation. Dr. Hibbitts diagnosed healing proximal humerus fracture of the right shoulder. Dr. Hibbitts indicated that he would order formal physical therapy and reviewed restrictions with Plaintiff. (Tr. 345). On June 2, 2011, Dr. Hibbitts reevaluated Plaintiff and noted that Plaintiff had fallen in the shower 5 days prior. Plaintiff reported soreness but no real worsening pain.   Dr. Hibbitts recommended an organized rehabilitation plan. (Tr. 357).

On June 10, 2011, Dr. Hibbitts provided a statement indicating that Plaintiff had "a couple of serious musculoskeletal problems." Dr. Hibbitts stated that Plaintiff's most serious problem was his right shoulder which was originally thought to be a cervical problem. Dr. Hibbitts explained that Plaintiff had several structures in his rotator cuff that were torn and the "nearby muscles are spasming in an effort to control the positioning of the shoulder, in addition to the pain resulting from the damage to the structure of the shoulder itself, the constant spasms causing pain and loss of motion." Dr. Hibbitts stated, "With this problem, it would be just about impossible for Plaintiff to handle any work that required him to suspend his arm above a work surface or to use it for any activity that requires more than minimal reaching." Dr. Hibbitts also stated that Plaintiff's spasms "also cause pain that I would expect would be severe enough to frequently interrupt tasks." Dr. Hibbitts indicated that surgical repair of the shoulder had done well, but Plaintiff fell and broke his humerus and dislocated his hip. Plaintiff had suffered extensive damage to the cartilage at the head

15

of the humerus requiring surgery to reattach the cartilage and a plate to bind the humerus back together. Dr. Hibbitts stated that the second operation was "recent" and Plaintiff continued to have a "fair amount of pain." Dr. Hibbitts indicated that this pain would certainly improve, but stated,

> However, because of this more recent break and particularly because of the cartilage dislocation, he is going to have a lot of problems with his shoulder. There is going to be a good bit of scar tissue that is going to interfere with the motion of the shoulder, and there will probably be difficulty with the blood supply to the cartilage. This means that the joint will heal poorly and will deteriorate overtime.

Dr. Hibbitts explained that the details of Plaintiff's "ultimate level of function will only be known later, he is certainly going to have problems with any sort of activity that requires him to suspend his forearm above the table or perform more than occasional reaching activities." Dr. Hibbitts indicated that he "hoped" that Plaintiff will eventually be able to perform work with that arm that involves resting the elbow on the table but that they "cannot be certain." Dr. Hibbitts stated that Plaintiff had the separate problem of carpal tunnel syndrome on the left that was of "moderate" nature and they were attempting to deal with that through therapy. He noted that this problem would "probably not go away or get better without surgery." Dr. Hibbitts stated, "In order to preserve function in the hand, he should limit fine manipulation activities to an occasional basis; gross manipulation shoulder be no problem." Dr. Hibbitts also stated that he understood that Plaintiff had "some psychological problems" but he had not evaluated these problems. (Tr. 351).

On June 30, 2011, Dr. Hibbitts reevaluated Plaintiff for worsening hip pain. Plaintiff reported that his pain was going down the medial aspect of his thigh, stopping just above the knee. Plaintiff walked with a slight limp and had significant pain with hip flexion and external rotation. Dr. Hibbitts ordered an MRI arthrogram. (Tr. 356).

On July 22, 2011, Plaintiff had an arthrogram and MRI of his left hip which showed a

detached posterior labrum and a tear through the base of the anterior labrum. (Tr. 352-354).

On August 1, 2011, Dr. Hibbitts reevaluated Plaintiff and reviewed his recent diagnostic tests. Dr. Hibbitts stated that Plaintiff had a symptomatic acetabular labral tear of his left hip which required surgical repair. (Tr. 355)

On August 10, 2011, Jason Folk, M.D., evaluated Plaintiff for left hip pain. X-rays showed some osteopenia of the femoral neck and head. Plaintiff had pain with flexion to about 85 degrees. His pain was exacerbated with slight internal and external rotation and he had pain with internal log roll as well. Dr. Folk stated that Plaintiff had significant capsular tightness. Dr. Folk prescribed physical therapy and indicated that they would treat Plaintiff's stiffness first and then treat his labral tear as needed. (Tr. 358-359)

On September 22, 2011, Plaintiff was evaluated at Laurens County Mental Health Clinic. Plaintiff complained of having poor sleep and having difficulty being around other people. Plaintiff reported having multiple surgeries, being unable to work, and taking Lortab daily. Following a history and mental status examination, Plaintiff was diagnosed with major depressive disorder, recurrent, moderate. He was assessed with a GAF score of 45. Plaintiff was prescribed mirtazapine for depression and sleep. He was encouraged to maintain regular attendance for counseling. (Tr. 370-371)

On October 19, 2011, Dr. Folk reevaluated Plaintiff who reported feeling worse since his last visit. Dr. Folk noted that Plaintiff's motion had improved but he continued to have significant pain in the anterior aspect of his left hip. Following a physical examination and MRI review, Dr. Folk diagnosed hip pain and left hip internal derangement with pincer impingement. Dr. Folk recommended surgical repair which Plaintiff agreed to proceed with. (Tr. 363-364)

17

On November 4, 2011, Plaintiff underwent left hip arthroscopy with labral debridement, synovectomy, and rim trim. (Tr. 365-369) [1]

## VI. PLAINTIFF'S REPORTS AND ADMINISTRATIVE HEARING TESTIMONY

In September 2009, Plaintiff reported that he took care of his parents, a girlfriend, children and dogs. (Tr. 173). He prepared meals on a daily basis, cleaned, did laundry, and mowed the yard. (Tr. 174, 180). He didn't like going out in public by himself, but did go shopping once a month. (Tr. 175). His hobbies included watching television, reading, playing video games and spending time with his family. (Tr. 176). He said he had problems dealing with people other than family members and close friends. (Tr. 177). He could walk one-half mile, but then needed to rest until his pain stopped. (Id.). He said he could not pay attention for long periods, but did okay at following written directives and did very well at following spoken ones. (Id.). He claimed he did not get along well with authority figures and had lost jobs due to losing his temper after getting overwhelmed. (Tr. 178).

In January 2010, Plaintiff reported his condition had gotten worse; he now had trouble lifting heavy objects, sometimes did not want to get out of bed, and got worn out when doing house cleaning. (Tr. 187). In June 2010, Plaintiff reported he could not focus well and was having trouble holding a rake to do yard work; he also said that he felt everyone was watching him when he went

---

[1] Plaintiff indicates that the following additional medical evidence was submitted to the appeals council. On February 8, 2011, Plaintiff underwent arthroscopic rotator cuff repair, as well as biceps tendinosis and arthroscopic Mumford with subacromial decompression of his right shoulder. (Tr. 374-376) On April 12, 2011, Plaintiff underwent an open reduction and internal fixation of his proximal humerus fracture. (Tr. 372-373) On October 10, 2011, Dr. Hibbitts reevaluated Plaintiff for continued left hip pain. On examination, Plaintiff had pain with flexion and internal rotation with abduction which Dr. Hibbitts indicated corresponded with his labral acetabular tear. Dr. Hibbitts stated that they would help Plaintiff with getting a follow-up appointment with Dr. Folk. (Tr. 383)

out in public. (Tr. 190). In July 2010, Plaintiff said he managed his panic attacks by going someplace where he could be alone and calming himself down. (Tr. 191).

At the November 2011 administrative hearing (Tr. 30-78), Plaintiff testified that he lived with his father, his girlfriend and two children (one six years old, one almost two years old). (Tr. 36, 38-39). When his girlfriend worked during the day, he and his father took care of the younger child. (Tr. 39). He testified he had lost his last job in 2008 because he took a break and because he could not handle the pressure. Later, his employer would not let him come back to work. (Tr. 41). At this point, his mother had cancer, which led to her death around two years prior to the hearing. (Tr. 42). He said he did not seek any treatment for medical problems between 2000 and 2010 because he couldn't afford to see a doctor (Id.). He claimed he tumbled off the roof of his mobile home in 2011, while trying to help his father "do some things."(Tr. 34, 42-43). He had just recently undergone hip surgery by Dr. Folk (Tr. 44). He had gotten medical coverage through Medicaid in 2010. (Tr. 47). He said he had recently begun to get mental health treatment, but couldn't remember at which facility. (Tr. 48-49). He claimed he couldn't stand to be around a lot of people. (Tr. 49). Currently he was using a cane (following his hip surgery). (Tr. 50). He testified he had problems with grip strength in his right hand. (Tr. 56) and said he had problems concentrating and remembering things. (Tr. 57). He said he didn't like confrontations with others or working under time pressure. (Tr. 59-60). Plaintiff testified that he had not tried to do any work since 2008, beyond minor home repair work, which he was not able to do. (Tr. 62).

Ms. Cornelius appeared as a vocational expert at Plaintiff's hearing. (Tr. 66). The ALJ asked her to assume that Plaintiff could do light work that did not involve climbing ladders or scaffolds or overhead reaching with his right dominant arm or exposure to vibrations, heights and dangerous

machinery, and which involved simple routine tasks and did not require working with the public. (Tr. 66-67). She testified, that, given Plaintiff's age, education, work background and such a residual functional capacity, Plaintiff should be able to do the occupations of mail sorter, plastic assembler and office helper. (Tr. 68). If Plaintiff could also not use his right hand and arm on more than an occasional basis, he would still be able to do the occupations of shipping and receiving weigher, tube assembler and proofreading helper. (Tr. 70-73). She testified that Plaintiff would not be able to do these jobs if his concentration was frequently disrupted. (Tr. 73)

In issuing his February 17, 2012 decision, the ALJ followed the Commissioner's five-step sequential evaluation. (Tr. 15-23). *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, he found that Plaintiff had not engaged in substantial gainful activity since April 30, 2008. (Tr. 16). Then, at steps two and three, the ALJ found that Plaintiff had the following severe impairments: an organic mental disorder, a generalized anxiety disorder, an affective disorder, borderline intellectual functioning, back/neck osteoarthritis, residuals of right rotator cuff tear surgery and a left hip dislocation , none of which, alone or in combination, meet or medically equal a Listing. (Tr. 16-17). Between steps three and four, after considering the entire record, the ALJ concluded that Plaintiff could perform simple, routine light work, with the following limitations: the claimant can occasionally push/pull with the left leg, can occasionally climb ramps and stairs, stoop, kneel, and crawl. He cannot climb ladders, ropes, and scaffolds, or reach overhead with his right dominant arm; he needs to avoid exposure to vibrations and to heights and dangerous machinery; he needs to avoid large crowds in the workplace, and he should not wait on the public as customers work at all. (Tr. 19). The ALJ found that Plaintiff could not perform any past relevant work. (Tr. 23). Based on this residual functional capacity and the vocational expert's testimony, the ALJ found that Plaintiff was

20

capable of performing work that existed in significant numbers in the national economy. (Tr. 23-24).

Accordingly, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act from

April 30, 2008 through the date of the decision. (Tr. 24).

## VII. DISCUSSION AND ANALYSIS

The initial issue raised by Plaintiff involves the opinion of Dr. Thompson.  As summarized,

*supra*, Dr. Thompson performed a consultative examination of Plaintiff at the Commissioner's

request in October 2009.

In his decision, the ALJ addressed Dr. Thompson's mental status evaluation as follows:

On October 26, 2009, Dr. Thompson consultatively examined the claimant and assessed the claimant with a history of anxiety disorder and adjustment disorder with anxiety, major depressive features and agoraphobia. However, Dr. Thompson determined that the claimant's adjustment disorder/depression was only moderate in severity and that the claimant's agoraphobia was merely mild to moderate in severity. The aforementioned determinations are sufficient to support a finding of severity, but not of a disability. In addition, Dr. Thompson noted that the claimant had several friends/a girlfriend and that the claimant helped out around the house, which indicated that the claimant was able to socially interact with others and to function. Furthermore, the claimant exhibited rambling but coherent speech/thought processes, intact orientation, adequate judgment/insight and adequate communication skills with no signs of distress. Dr. Thompson also observed that the claimant was able to follow simple to detailed instructions. Dr. Thompson's observations established that the claimant was able to mentally function, even with his mental issues. Of note, Dr. Thompson reported that the claimant was only taking over-the-counter medications. (Exhibit 4F). Nevertheless, the undersigned acknowledges that the claimant has mental disorders and therefore finds that the claimant is limited to performing simple, routine work with limitations in interacting with others.

(Tr. 22).

Additionally, the ALJ briefly mentioned Dr. Thompson's examination when discussing

Listing 12.05, and also indicated that his RFC finding was buttressed by various records, including

Dr. Thompson's records. (Tr. 19, 23). Accordingly, the ALJ seemingly accepted these portions of

Dr. Thompson's opinions but failed to indicate the weight he assigned to them, in technical violation

21

of relevant case law.

As acknowledged by the Commissioner in his brief, the ALJ never specifically indicated the weight he assigned to Dr. Thompson's opinion. This failure to weigh Dr. Thompson's opinion is contrary to the Commissioner's own rulings and regulations. The Social Security regulations require that the ALJ must consider and weigh all medical opinions, regardless of their source. The Social Security Rulings require that an ALJ must, evaluate opinion evidence from medical or psychological consultants using all of the applicable rules in 20 CFR §404.1527 and 20 C.F.R. §416.927 to determine the weight to be given to the opinion. See generally, SSR 96-2p. Reviewing courts are unable to determine if an ALJ's findings are supported by substantial evidence unless all relevant evidence has been explicitly evaluated and there is an indication of the weight given to the relevant evidence. As the Court explained in Torres v. Astrue, 2012 WL 243086 (D.S.C. Jan. 25, 2012), "we cannot determine if findings are unsupported by substantial evidence unless the [Commissioner] explicitly indicates the weight given to all of the relevant evidence." (Citing Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir.1984)). This requires the Commissioner "to indicate explicitly the weight accorded to the various medical reports in the record." Id. See also, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir.1983) ("The Secretary must present us with findings and determinations sufficiently articulated to permit meaningful judicial review."). Here, the ALJ neither assigned a weight to Dr. Thompson's opinion nor explained the reasons for any weight given as required by social security regulations.

The Commissioner asserts that the ALJ did look generally at the longitudinal evidence of Plaintiff's mental condition and that based on the totality of the record, the ALJ had a sufficient basis for preferring the opinions of reviewing psychologists as opposed to Dr. Thompson as a one time

examiner.  If the ALJ had stated this specifically (i.e., indicated that he was discounting the opinion for this reason), or even if he had addressed the entirety of Dr. Thompson's opinion, this argument might be more persuasive.  However, what the court finds notable and is that the ALJ did not include any discussion of the portion of Dr. Thompson's opinion in which he stated that "[a]s [Plaintiff] he presents today, I believe he would have difficulty maintaining pace and persistence in simple repetitive types of tasks." (Tr. 272). This portion of the opinion appears to be relevant in light of the VE testimony that if a person had frequent interruptions to concentration, persistence, or pace, that impairment would preclude all work. (Tr. 73). The ALJ cannot just set out parts of an opinion and stop at that. The ALJ is prohibited from cherry picking the evidence, that is, he may consider and discount evidence contrary to his views, or consider it and adopt it, but he cannot simply ignore it and skip over it. The ALJ is obligated to consider all evidence, not just that which is helpful to his decision. Robinson v. Colvin, 2014 WL 4954709 (2014) (citing Gordon v. Schweiker, 725 F.2d 231, (4th Cir. 1984) and Murphy v. Bowen, 810 F.2d 433, 437 (4th Cir. 1987)). Here the ALJ cited only portions of Dr. Thompson's opinion that supported his ultimate conclusion and ignored those portions that did not, without any indication of the weight being given to any portion of the opinion at all. The undersigned is constrained to recommend remand as it is not possible to determine if the ALJ's decision is supported by substantial evidence because the ALJ failed to fully consider the opinion of Dr. Thompson, failed to explain what weight was being given to the portions of the opinion cited, and failed to outline any reasons for accepting, rejecting or discounting that portion of the opinion or the remainder of the opinion which was not discussed.

Because the court finds that remand is necessary for the reasons outlined above, the court declines to specifically address Plaintiff's additional allegation of error by the ALJ. However, upon

remand, the Commissioner should take into consideration Plaintiff's remaining allegation of error, specifically, Plaintiff's allegation regarding the residual functional capacity in light the evidence relevant to Plaintiff's capabilities with his right arm.  See generally, Boone v. Barnhart, 353 F.3d 203, 211 n.19 (3d Cir. 2003) (remanding on other grounds and declining to address claimant's additional arguments).

## VIII.  CONCLUSION

Based on the foregoing, the court recommends that the Commissioner's decision be REVERSED pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be REMANDED to the Commissioner for further administrative action as set forth above.

Respectfully submitted,
s/Thomas E. Rogers, III
Thomas E. Rogers, III

December 16, 2014
Florence, South Carolina